Anita L. DOUD, Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY, Defendant.

No. 02–71749.

United States District Court,
E.D. Michigan,
Southern Division.

June 2, 2003.

See also 2003 WL 23469843.

Lewis M. Seward, Seward, Tally, Bay City, MI, for Anita L. Doud, Plaintiff.

Geneva S. Halliday, United States Attorney's Office, Detroit, MI, for Commissioner of Social Security, Defendant.

## ORDER

JULIAN ABELE COOK, Jr., District Judge.

This case involves an application by the Plaintiff, Anita Doud, for an award of Social Security Supplemental Security Income (SSI) benefits and Disability Insurance Benefits (DIB). At issue are motions for summary judgment that have been filed by Doud and the Defendant, the Commissioner of Social Security ("the Commissioner").

On March 31, 2003, the magistrate judge, who had been asked by the Court to submit a recommendation that would address the parties' dispositive motions, filed a Report pursuant to 28 U.S.C. § 636(b)(1)(A). In his Report, he recommended that the Court (1) grant Doud's motion for summary judgment, (2) deny the Commissioner's motion for dispositive relief, and (3) remand the case to the Commissioner for a computation and payment of benefits to which she is entitled.

The record indicates that neither of the parties have filed any objections to the Report within the time frame allowed by 28 U.S.C. § 636(b)(1) and Local Rule 72.1(d)(2). Therefore, the Court, following its review of the entire record, (1) accepts and adopts the recommendations within the Report, (2) grants Doud's motion for summary judgment, (3) denies the Commissioner's motion for dispositive relief, and (4) remands the case to the Commissioner for a computation and payment of benefits to which she is entitled under the law.

IT IS SO ORDERED.

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

CARLSON, United States Magistrate Judge.

**RECOMMENDATION:** Plaintiff's Motion for Summary Judgment should be GRANTED and Defendant's Motion for Summary Judgment should be DENIED, as there was no substantial evidence on the record that Plaintiff remained capable of performing a significant number of jobs in the economy.

\*     \*     \*     \*     \*     \*

Plaintiff, Anita Doud, filed an application for both Supplemental Security Income and Disability Insurance Benefits on July 23, 1998, alleging that she had been disabled and unable to work since June 29, 1998, due to dysthymia, adjustment disorder with depressed mood, personality disorder, affective disorder, and a peptic ulcer (TR 140–42, 109–11, 116, 120). Benefits were denied both initially and upon reconsideration by the Social Security Administration (TR 112, 117, 123, 129). A requested de novo hearing was held on November 30, 1999, before Administrative Law Judge (ALJ) Larry Miller, who subsequently found that the claimant was not entitled to benefits under the Medical–Vocational Guidelines as she retained the capacity for a full range of medium work (TR 489–90). The Appeals Council remanded that decision indicating that the ALJ failed to consider the Plaintiff's non-exertional impairments including her alleged depression and obesity (TR 499–501). A second administrative hearing was held on December 6, 2000, before ALJ William J. Musseman who also denied benefits and found that the claimant was capable of performing a significant range of light work (TR 32–34). The Appeals Council declined to review the decision of ALJ Musseman and Plaintiff commenced the instant action for judicial review (TR 8–9). Both parties

have filed Motions for Summary Judgment, the Plaintiff alternatively filed a Motion for Remand, and the issue for review is whether Defendant's denial of benefits was supported by substantial evidence on the record.

Plaintiff was thirty-two years old at the time of the administrative hearing, had a high school diploma and previously worked as both a cashier and laborer (TR 25, 151). She stopped working on June 29, 1998, after being terminated for assaulting the owner of the business (TR 53–54). She alleged that she was unable to work due to her uncontrollable anger, depression, anxiety, mood swings, and migraine headaches which allegedly caused blackouts (TR 161–62). In a daily activities report, she indicated that she was able to cook, clean, grocery shop, perform some yard work, attend college classes, go to church and go fishing occasionally, drive, talk to family on the telephone, and visit with family (TR 150, 161, 165, 167). In a similar daily activities report, her mother reported that the claimant was able to help with the laundry, feed her dogs, watch television, but that she did not respond well to people in authority, she wanted to kill herself, would beat her dogs, and wanted to hurt other people (TR 67, 154, 157).

Although the record contained evidence of both physical and mental impairments, the Plaintiff conceded that only her mental impairments prevented her from working (Pl. Reply to Defendant's Motion for Summary Judgment at 1). Therefore the undersigned shall summarize in this report and recommendation only her non-exertional impairments such as obesity, depression and personality disorders, headaches, and abdominal pains. In August 1997, she was examined by her long time treating physician, William George, M.D., who concluded that the Plaintiff was having problems which "may be panic disorder" for which he prescribed Paxil (TR 205). In

June and September 1997, she was diagnosed as suffering from viral gastroenteritis (TR 204–05). In October, Dr. George reported that "there is a strong family history of depression ... [and] she has had some recent symptoms that may be related to depression, and is given trial of Prozac" (TR 203). In January 1998, Dr. George examined her for complaints of a pressure type headache and chest discomfort and prescribed Flexeril and Darvocet (TR 202). In February 1998, the doctor reported that the claimant was having some social difficulties at home and prescribed Xanax (TR 201). In March 1998, she underwent CT scan examination for her persisting headaches, but the results were unremarkable (TR 201).

During the administrative hearing, the Plaintiff testified that she swung at coworkers on numerous occasions, threatened to kill her FIA caseworker, and experienced road rage on a frequent basis (TR 54–57, 81–82, 86, 89). She also testified that she suffered from hypertension which caused dizziness, nausea, and lightheadedness which occurred about once a week and lasted all day (TR 89–90). Her mother who also testified at the hearing, indicated that her daughter routinely threatened people and she even obtained a power of attorney so that she could handle her daughter's affairs and relieve some of her stress (TR 102–103). A vocational expert present at the hearing, testified in response to hypothetical questions posed by the ALJ, that a person with the Plaintiff's age, education, and past work experience, limited to a full range of light work with non-exertional limitations such as no repetitive bending, squatting, kneeling, crawling, or climbing, no dealing with the general public, rare dealings with co-workers, minimal supervision, no complex tasks (one or two step only), would be able to perform jobs in the regional economy such as inspector, machine operator, and as-

sembler (TR 105). Assuming the aforementioned restrictions "plus add an additional limitation of [an] inability to deal in a civil manner with any other living human being, a minimum of three times a month on an unscheduled basis," the vocational expert indicated that the claimant could not perform any jobs in the economy (TR 105).

In April 1998, the Plaintiff was examined by Steve Klegman, D.O., for abdominal discomfort but there was no evidence of acute abdominal pathology (TR 223). In June 1998, she was admitted to the hospital for depression, an inability to sort out her present problems, prioritize, or make major decisions (TR 223). The attending physician diagnosed her as suffering from suicidal ideologies, loneliness, adjustment disorder with depressed mood, personality disorder with apparent cluster B traits, and deficient self-care skills and decision making (TR 234–36). Her prognosis was fair with continued follow up and she was prescribed Serzone and Prilosee (TR 236). She was readmitted two weeks after her discharge upon further symptoms of depression and uncontrollable anger including an incident during which she beat her puppy (TR 230). Her treating psychiatrist, Ron Melvin, D.O., concurred with the previous diagnoses but added grief loss issues with her father's death, ruled out a mood disorder, assigned a GAF of about 65[1], recommended psychotherapy, and prescribed Restoril as a sleeping aid (TR 230–31). In October 1998, she was re-evaluated by Dr. Melvin who opined that while she was doing well, she continued to experience suicidal thoughts (TR 354–55).

In March 1999, Plaintiff was re-examined by Dr. Melvin who reported that she had stopped taking her medications (apparently based on advice given to her by Dr. George, TR 377) and was becoming more depressed (TR 237). She also reported that she dreamt of killing people, found it difficult to control her anger, and had periodic thoughts of suicide (TR 237). She also complained to Dr. George of chest pains and trouble breathing; however, pulmonary function testing was normal (TR 377, 372).

In December 1998, Plaintiff underwent a consultative psychological evaluation by licensed psychologist, George Pestrue, Ph. D., and responded, upon questioning:

> The main reason right now that I can't work is that I can't handle stress. Under stress I get quite violent. I kind of black out and I want to fight. When I get to that point I won't care if they get hurt or end up in the hospital or die. One time at my last job I asked one of the foremen a question. He got on my case because I didn't ask my foreman about it. I took a swing at him. If it wasn't for another foreman getting in the way I think I would have done damage to him. I lot of times I try to control it. I'll control it at work and when I get home I'll beat my animals. I don't care who it is. If they get in my way I'll hurt them. I'll get sick to my stomach from stress. My previous job I walked out on it because I got to the point where I didn't want to argue with them because I knew I was right. They had to break up a couple of fights because I was going to do harm to the other person. I do threaten people. I

---

1. Global Assessment of Functioning represents the examiner's judgment of the individual's overall level of psychological functioning. American Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed.2000). A rating of 61–70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but that the individual is generally functioning pretty well. *Id.* at 34.

threaten to kill them. I lost a good friend because of that. I told her if she came within so many feet of me I'll kill her.

(TR 296). Dr. Pestrue also noted that Plaintiff's self-esteem appeared poor, her general motor activity appeared moderately anxious and tense, while her motivation for many of life's usual activities, including pleasurable activities, was moderately limited (TR 296–302). He assigned a GAF score of 51[2] and diagnosed adjustment disorder with depression and anxiety, dysthymia, personality disorder with cluster B traits based on impulsivity, marked anomie, aggressive and violent tendencies, difficulty controlling anger, self-destructive tendencies, some attention getting behaviors, and recurrent suicidal gestures and threats (TR 302). By August 1999, Dr. Melvin reported that she was doing well and had no suicidal thoughts (TR 360–61). In November 1999, however, her psychotherapist, Laura Alton, opined that the claimant would have difficulty working at a regular job on a sustained basis because she has problems getting along with others (TR 405).

In January 2000, Dr. Melvin reported that the Plaintiff was doing fair, she had received all As in her last semester of classes, but that her anger was a bit more out of control than in the past (TR 447–48). In August 2000, Dr. George also observed that the claimant's depression appeared to be under control (TR 438); however, in September he reported increased depression and that she was failing two classes (TR 439). In a letter dated September 30, 2000, the claimant recounted several incidents of her explosive anger (TR 424). In one instance, she threatened to hit her neighbor, in another she told a friend "not to touch me or come too close to me or I will hit him until he was out cold" (TR 424). On another occasion, she told a college administrator that she could not tutor on a certain date because of scheduled medical tests, following which the administrator told her she could no longer work as a tutor. In addition to her nasty behavior, she also indicated that she wanted to take a swing at the administrator (TR 425, 86).

In October 2000, the Plaintiff underwent a consultative psychological examination by psychiatrist Mumtaz Suleman, M.D., who assigned a GAF score of 50[3] to 55 and indicated that Dr. Melvin had reported that the claimant's major depressive disorder, recurrent, was largely in remission (TR 456–57). Dr. Suleman also noted:

> She is stating that she is having increased signs of her depression currently, however, her affect does not reflect this difficulty on the date of her intake. It is difficult to ascertain if her difficulties are partially related to her motivation to obtain disability benefits or if there is the sole concern of increased difficulties with depression.

(TR 456). Also in October 2000, Dr. George opined that her depression "just [wasn't] getting a whole lot better" (TR 461). In November 2000, Dr. George opined that "from a physical standpoint, she could perform sedentary work; however, due to her depression and problems with anger control, she cannot work at this time. Once her depression is controlled,

---

2. A GAF score of 51–60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). American Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 34 (4th ed.2000).

3. A GAF score of 41 to 50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). American Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 34 (4th ed.2000).

she will be able to handle full-time employment" (TR 468–69).

## ADMINISTRATIVE LAW JUDGE'S DETERMINATION

The ALJ found that although the Plaintiff met the disability insured status requirements, had not engaged in substantial gainful activity since her alleged onset date, and suffered from obesity, dysthymia, and a personality disorder (TR 28), all severe impairments, she did not have an impairment that met or equaled the Listings of Impairments (TR 32–33). Additionally, the ALJ found Plaintiff's testimony was not totally credible, found she could not perform any of her past relevant work, but concluded that she was capable of performing a significant range of light work such as inspector, machine operator, and assembler and therefore was not suffering from a disability under the Social Security Act (TR 31–33).

## STANDARD OF REVIEW

■ Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's decisions. Judicial review of those decisions is limited to determining whether her findings are supported by substantial evidence and whether she employed the proper legal standards. *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Walters v. Commissioner,* 127 F.3d 525, 528 (6th Cir.1997). Substantial evidence is more than a scintilla but less than a preponderance; it is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Richardson,* 402 U.S. at 401, 91 S.Ct. 1420 (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126 (1938)); *Walters,* 127 F.3d at 528. It is not the function of this court to try cases *de novo,* or resolve conflicts in the evidence, or decide questions of credibility. *See Brainard v. Secretary,* 889 F.2d 679,

681 (6th Cir.1989); *Garner v. Heckler,* 745 F.2d 383, 387 (6th Cir.1984).

■ In determining the existence of substantial evidence, the court must examine the administrative record as a whole. *Kirk v. Secretary,* 667 F.2d 524, 536 (6th Cir.1981), *cert. denied,* 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion. *Her v. Commissioner,* 203 F.3d 388, 389–90 (6th Cir.1999); *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir.1986) (en banc) (noting that the substantial evidence standard "presupposes that there is a zone of choice within which decision makers can go either way, without interference from the courts").

## DISCUSSION AND ANALYSIS

The Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis. In the first four steps, Plaintiff had to show that:

(1) she was not presently engaged in substantial gainful employment; and

(2) she suffered from a severe impairment; and

(3) the impairment met or was medically equal to a "listed impairment;" or

(4) she did not have the residual functional capacity (RFC) to perform her relevant past work.

*See* 20 C.F.R. § 404.1520(a)-(e). If Plaintiff's impairments prevented her from doing her past work, the Commissioner, at step five, would consider her RFC, age, education and past work experience to determine if she could perform other work. If she could not, she would be deemed disabled. *Id.* § 404.1520(f). The Commis-

sioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her,* 203 F.3d at 391. To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Secretary,* 820 F.2d 777, 779 (6th Cir.1987). This "substantial evidence" may be in the form of vocational expert testimony in response to a hypothetical question, "but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments.'" *Id.* (citations omitted).

■■ In her brief, Plaintiff argues primarily that the ALJ erred by failing to give proper weight to the medical opinion of her long time treating physician Dr. George (Pl. Brief at 4–7). It is well settled that the opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted by other substantial medical evidence of record then the opinions should be given complete deference. *Harris v. Heckler,* 756 F.2d 431, 435 (6th Cir. 1985); *Garner v. Heckler,* 745 F.2d 383, 388 (6th Cir.1984). Here, the ALJ rejected Dr. George's opinion because, although he is the claimant's treating physician of many years;

> [H]e nevertheless is not a mental health specialist. The undersigned accepts Dr. George's opinion with respect to the claimant's physical condition as this is within his specialty. However, his opinion that she cannot perform full time work until her depression is controlled is an opinion that is more acceptable of a

professional whose specialty is in the mental health field and thus cannot be fully accepted.

(TR 30). The ALJ also relied on a state-agency physician report in which it was opined that the claimant was unable to sustain adequate performance of complex, technical tasks or tasks involving extensive interaction with the public, however, she could learn and perform simple rote tasks on a sustained basis (TR 30). Having reviewed the entire record, the undersigned is persuaded that Dr. George, although not a mental health professional, offered an opinion which was consistent with both the medical evidence of record and the Plaintiff's subjective allegations of disabling depression and personality disorder. There are no significant contrary medical reports and Dr. George's opinion should have been given deferential weight.

Dr. George, a long time treating physician, indicated that although the Plaintiff was physically capable of performing sedentary work, she could not do so based on her depression and uncontrollable anger. This opinion was consistent with the Plaintiff's treating psychotherapist, Laura Alton, who also indicated that the Plaintiff was precluded from working because of issues surrounding her ability to work with others. These two opinions were consistent with her GAF scores as assigned by her treating psychiatrist Ron Melvin who indicated a GAF score ranging from 40 [4] to 65, by licensed psychologist George Pestrue, Ph. D., a consultative examiner who indicated a GAF score of 51 (TR 249–51, 302), and by independent examining psychiatrist Mumtaz Suleman who indicated a GAF score of 50–55. Furthermore, these

---

**4.** A GAF score of 31 to 40 indicates some impairment in reality testing or communication OR major impairment in several areas such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school). American Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 34 (4th ed.2000).

scores were reported as early as June 1998 and as recent as October 2000 and thus further substantiate a disabling condition which lasted for longer than twelve months. Therefore, notwithstanding intermittent periods when she was observed doing better, it is apparent that Plaintiff's symptoms of depression and personality disorder were sufficiently apparent to the examining physicians, both those in the mental health profession as well as Dr. William George.

Consistent with her diagnosed depression and personality disorder, the Plaintiff was admitted to the hospital on two occasions in 1998 for depression, uncontrollable anger, an inability to sort out her problems or make decisions. Admission to a hospital's psychiatric ward is certainly an option of last resort for anyone suffering from a mental illness, and Plaintiff was terminated by a number of employers for behavioral reasons (TR 53–57). These facts certainly suggest a mental impairment sufficiently serious to preclude all regular employment. Other examples of Plaintiff's unpredictable and erratic behavior include the numerous threats to coworkers and friends, her attempted batteries of people with whom she had contact, her recurrent road rage witnessed by her mother on several occasions, and, worse yet, the beating of her dogs.

█ The undersigned is also persuaded that the ALJ's rejection of the Plaintiff's testimony as lacking credibility was unsupported by substantial evidence. A finding that a claimant is not credible must be supported by substantial evidence in the same manner as any other ultimate factual determination.[5] Findings of credibility must be made based on the entire record:

> [T]he adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record ... includ[ing] ... the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record.

SSR 96–7p, Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, 61 Fed. Reg. 34483, 34485 (1996). The ALJ rejected Plaintiff's allegations by noting:

> Thus, although the claimant has physical and mental limitations, she is able to attend college, do housework, shop and play or work on the computer. The claimant's allegations of the intensity, persistence and functionally limiting effects of her symptoms are very exaggerated and not substantiated by the objective medical or other evidence in the case record and therefore her allegations in this regard are not wholly credible.

(TR 30). These facts, as summarized by the ALJ, certainly do not amount to substantial evidence that Plaintiff exaggerated her functional inability in light of the fact that she had numerous problems with both classmates and college administrators, and at one time was receiving all As but the next semester was failing two classes. Although it is true she attended college

---

5. *See Harris v. Heckler,* 756 F.2d 431 (6th Cir.1985) (rejecting the ALJ's "unexplained credibility finding" because the evidence of record "clearly corroborate[d]" plaintiff's assertions of pain); *see also Brock v. Secretary,* 791 F.2d 112, 114 (8th Cir.1986) ("[B]efore an ALJ may reject a claimant's subjective complaints of pain, the ALJ must make express credibility determinations and set forth the inconsistencies in the record that lead the ALJ to reject the claimant's complaints of pain.").

courses, it is not true that she was without problems in that environment. Rather, the record sheds light on how she interacted with others in her activities of daily living and supports her subjective complaints of depression, uncontrollable anger, and a strong personality disorder. The record also makes abundantly clear Plaintiff's desire to isolate herself and minimize her contact with others. She had few friends, often behaved in a socially unacceptable manner, and testified that she lost several friends and family because of her threatening violent temper.

Based on the foregoing, the undersigned is persuaded that the rejection of Plaintiff's credibility by the ALJ, was not supported by substantial evidence. During the administrative hearing, the vocational expert testified that if Plaintiff's allegations were accepted as true, she would be unable to perform either her past relevant work or any other jobs in the regional economy. There is simply no substantial evidence that Plaintiff could be gainfully employed in any work environment, and, accordingly Defendant's Motion for Summary Judgment should be denied.

The question now becomes whether this matter should be remanded to the agency for further consideration, or remanded for an award of benefits. The Sixth Circuit Court of Appeals has held:

> If a court determines that substantial evidence does not support the Secretary's decision, the court can reverse the decision and immediately award benefits only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits.

*Faucher v. Secretary,* 17 F.3d 171, 176 (6th Cir.1994). *See also Mowery v. Heckler,* 771 F.2d 966, 973 (6th Cir.1985) (noting that the Secretary's decision can be reversed and benefits awarded if"the decision is clearly erroneous, proof of disability if overwhelming, or proof of disability is strong and evidence to the contrary is lacking"). Considering that all factual issues have been resolved, a remand to take additional evidence would only delay the receipt of benefits to which Plaintiff is clearly entitled. Accordingly, it is recommended that Plaintiff's Motion for Summary Judgment be granted, Defendant's Motion for Summary Judgment denied, and the instant case be remanded to the Commissioner for a computation and payment of benefits to which she is entitled.

Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary,* 932 F.2d 505 (6th Cir.1991); *United States v. Walters,* 638 F.2d 947 (6th Cir.1981). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation. *Willis v. Sullivan,* 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir.1987). Pursuant to Rule 72.1(d)(2) of the *Local Rules of the Unites States District Court for the Eastern District of Michigan,* a copy of any objection must be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifi-

cally, and in the same order raised, each issue contained within the objections.

May 2, 2003.