NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 19a0312n.06

Case No. 18-2358

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED

Jun 19, 2019
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| CHARLES MAX LIVINGSTON, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE WESTERN DISTRICT OF |
| COMMISSIONER OF SOCIAL SECURITY, | ) | MICHIGAN |
| | ) | |
| Defendant-Appellee. | ) | |

BEFORE: MOORE, COOK, and READLER, Circuit Judges.

COOK, Circuit Judge. Charles Max Livingston appeals a district court decision affirming the Commissioner of Social Security's denial of his disability insurance benefits application. Because substantial evidence supports the Commissioner's findings, we AFFIRM.

**I.**

Livingston, a forty-nine-year-old high school graduate with a turbulent work history, applied for a period of disability and disability insurance benefits under the Social Security Act in 2013, citing the following work-inhibiting health problems: generalized anxiety disorder, attention-deficit/hyperactivity disorder, deficient memory, irritable bowel syndrome, gastroesophageal reflux disease, an unspecified learning disability, depression, and a possible receptive language disorder. The agency denied his application. Following a hearing convened over two years later, so did an administrative law judge ("ALJ").

After the appeals council denied review, transforming the ALJ's opinion into the Commissioner's final decision, Livingston filed this action. Hearing the case with the parties' consent, the magistrate judge affirmed, finding that substantial evidence supported the agency's decision, and Livingston now appeals.

**II.**

We take a fresh look at a district court's Social Security benefits decision, *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 833 (6th Cir. 2016), but must affirm the Commissioner's underlying conclusions if substantial evidence supports them and the agency applied the correct legal standard, *see Colvin v. Barnhart*, 475 F.3d 727, 729–30 (6th Cir. 2007). "Substantial evidence requires 'more than a mere scintilla' but less than a preponderance," and constitutes "such 'relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Miller*, 811 F.3d at 833 (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)). "Even if the evidence could also support another conclusion, the decision of the [ALJ] must stand if the evidence could reasonably support the conclusion reached." *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389–90 (6th Cir. 1999).

In denying Livingston benefits, the ALJ applied the Social Security Administration's familiar five-step disability analysis, asking:

> (1) Does the claimant show [he] is not engaged in "substantial gainful activity"?
> (2) Does the claimant have a severe impairment? (3) Does the impairment meet any one of the items on a "list of impairments presumed severe enough to render one disabled"? (4) Can the claimant perform [his] past jobs? (5) Can the claimant perform other jobs that exist in significant numbers in the national economy?

*Taskila v. Comm'r of Soc. Sec.*, 819 F.3d 902, 903 (6th Cir. 2016) (quoting *Barnhart v. Thomas*, 540 U.S. 20, 24–25 (2003)); *see* 20 C.F.R. § 404.1520(a)(4). Livingston's cause failed at the

fourth step, when the ALJ found that he retained sufficient residual functional capacity to perform past work as a janitor. The residual functional capacity conclusion stated:

> I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b), except that he can only occasionally climb ladders, ropes, and scaffolds and can no more than frequently climb ramps and stairs. . . . He is limited to simple, routine, repetitive tasks, and he must be employed in a low-stress job (meaning a job that requires less than occasional decision-making and less than occasional changes in the work setting). The claimant must have work that is not at a production rate or pace. He can have no more than occasional interaction with the public and with co-workers (and no tandem tasks with any co-workers), and he can have no more than occasional supervision (which must be on-site). Finally, the claimant must be permitted to be off-task for five percent of the workday, for health reasons.

R. 8-2, PageID 46–47. The ALJ relied on several sources, including medical evidence supplied by three consulting professionals—Dr. Jessica Caldwell, Ph.D., Dr. Gary Kilpela, Psy.D., and Michael Varney LLP, CAP—and analysis provided by state agency examiner Dr. Bruce G. Douglass, Ph.D.[1]

Livingston principally argues that the ALJ improperly weighed the medical source opinions en route to determining his residual functional capacity, thus acting contrary to the Administration's regulations. We disagree. In contrast to Livingston's assertions, the ALJ reached his residual functional capacity findings after sensibly evaluating the record, and substantial evidence supports his weighing of the medical source opinions. We address the ALJ's consideration of each medical professional's opinion.

*Mr. Varney.* In November 2013, Varney—a counselor Livingston visited for mental health services—conducted a psychological evaluation. Varney assessed below-average scores on tests measuring Livingston's problem solving, abstract reasoning, and intellectual functioning abilities.

---

[1] The ALJ also discussed a multiple-choice questionnaire completed by Tracey Nelson, a nurse practitioner. But because Nelson's questionnaire does not feature prominently in the argument section of Livingston's brief, we do not specifically address it here.

He also found deficient Livingston's memory, learning skills, and impulse control. Varney assigned Livingston a Global Assessment of Functioning ("GAF") score of 55.

The ALJ gave Varney's opinion "some weight." He questioned the accuracy of some of Varney's characterizations, citing the apparently erroneous claim that Livingston's IQ fell in the below-average (rather than average) range. He also credited the memory deficits Varney observed. But citing some of Livingston's attested daily activities—driving, cooking simple meals, shopping, doing the laundry, and managing personal finances—the ALJ concluded that Livingston could perform simple, routine tasks notwithstanding his deficits. Finally, he found Varney's GAF score consistent with the record and reflective of moderate psychological symptoms not expected to fully preclude gainful employment.

Livingston argues that the ALJ focused too heavily on peripheral issues raised by Varney's opinion and minimized Varney's findings regarding his "severe anxiety." But Livingston fails to direct us to any relevant cases or regulations, and his bare assertions do not convince us that the ALJ erred in weighing Varney's assessment. As an initial matter, ALJs must give "good reasons" only for their weighing of "treating source" opinions, 20 C.F.R. § 404.1527(c)(2); *see Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007), and Livingston does not argue that Varney qualifies as a "treating source." For non-treating sources, ALJs look to several considerations, including "[s]upportability," "[c]onsistency," and other factors tending "to support or contradict the medical opinion." 20 C.F.R. § 404.1527(c); *see Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). Thus, the ALJ properly cited Livingston's daily activities and the GAF score's consistency with the whole record in weighing Varney's opinion. *See* 20 C.F.R. § 404.1527(c); *Miller v. Comm'r of Soc. Sec.*, 524 F. App'x 191, 194 (6th Cir. 2013) (citing the ability "to engage in significant daily activities" as a factor the ALJ appropriately considered);

*Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010). Substantial evidence supports the ALJ's evaluation of Varney's opinion.

   *Dr. Caldwell.* About eight months after the appointment with Varney, Livingston visited Dr. Caldwell for a neuropsychological consultation. As the ALJ relayed in his opinion, Caldwell described Livingston as well-groomed, casually dressed, and fully oriented, except that he could not recall the exact date. Caldwell observed that Livingston showed reduced eye contact, followed social cues, committed occasional paraphasic speech errors, engaged in tangential thought processes, exhibited no signs of a formal thought disorder, denied suicidal ideation, reported an anxious and depressed mood, displayed increased positivity and humor as the evaluation progressed, and successfully concentrated throughout the evaluation. Caldwell reported "average" test scores with respect to intelligence, general intellectual ability, attention and processing speed, verbal fluency, visuospatial skills, and motor skills. She flagged "severe" impairments in visual organization and planning, and in recalling a list of words. She also noted that "[o]n a computerized test of sustained attention, he showed very impaired performance consistent with ADHD." R. 8-7, PageID 330.

   The ALJ neglected to assign specific weight to Caldwell's assessment, but discussed her findings at length in the residual functional capacity section of the opinion. For instance, he relied on Caldwell's observations in finding Livingston able to perform simple, routine tasks and noted consistency between Caldwell's results and the GAF score assigned by Varney.

   Livingston complains that the ALJ failed to credit the consistencies between Caldwell and Varney's opinions, specifically with respect to "severe impairments" in sustained attention, visual organization, and remembering lists of words. But the ALJ considered these impairments and mentioned them in his findings. Viewing the entire record, he concluded that the bulk of the

medical evidence—and Livingston's own testimony—militated in favor of finding that Livingston retained the ability to perform light work. As with his assessment of Varney's opinion, the ALJ's weighing of Dr. Caldwell's opinion fell safely within the constraints imposed by the regulations and our precedent. *See* 20 C.F.R. § 404.1527(c); *Ealy*, 594 F.3d at 514.

*Dr. Kilpela.* At Livingston's first consultative examination, Dr. Kilpela, a psychologist hired by the state agency, evaluated Livingston's mental state. Kilpela reported several observations about Livingston: "[h]is grooming and hygiene were disheveled. He looked rather odd, wide eyed, and seemed a bit dazed. His eye-contact was minimal. His mood was anxious." R. 8-7, PageID 309. Kilpela noted Livingston's anxiety issues, speculated that they were connected to Livingston's memory deficits, and acknowledged that eccentricity might explain Livingston's odd presentation. Kilpela assigned Livingston a GAF score of 48. Wrapping up his observations, Kilpela concluded that "[i]f the way [Livingston] presented today is indicative of how he would be in a social setting (like work), it would be difficult to imagine him being successful." *Id.* at PageID 310.

The ALJ accorded Kilpela's report "limited weight." He observed the atypical nature of Livingston's anxious presentation at that appointment and contrasted it with Livingston's presentation at Dr. Caldwell's consultation and other medical appointments in 2015. The ALJ also concluded that Livingston's anxiety would not stop him "from performing simple, routine, and repetitive tasks at a familiar worksite where there would be few stressors, little interpersonal contact, and no work at a production rate or pace." R. 8-2, PageID 51. He stated that this "would be especially true" with a 5% off-task allowance. *Id.* Finally, the ALJ highlighted a treatment note in Livingston's medical records suggesting that infrequent doses of Ativan significantly ameliorated his anxiety.

Livingston challenges the ALJ's treatment of Dr. Kilpela's findings about his anxiety. But, as outlined above, the ALJ supported his conclusions by citing inconsistencies with behavior at other appointments and the positive effect of medication on Livingston's mood. These reasons pass muster under the regulatory framework and constitute substantial evidence. *See* 20 C.F.R. § 404.1527(c); *Ealy*, 594 F.3d at 514.

*Dr. Douglass.* Dr. Douglass, a state agency psychologist, reviewed Livingston's case in October 2013 and completed a report for Livingston's initial benefits determination. At the time of Douglass's report, only Dr. Kilpela had performed a consultative examination. After relaying many of Kilpela's findings, Douglass concluded that Livingston "retains the capacity to perform routine, 2-step tasks on a sustained basis." R. 8-3, PageID 101.

The ALJ assigned Douglass's assessment "substantial weight" because he found it "consistent with the record as a whole." R. 8-2, PageID 52. Livingston maintains that the ALJ erred by according Douglass's opinion more weight than the examining medical opinions and, in doing so, ignored the section of Douglass's report detailing concentration and persistence impairments. We disagree with both contentions. First, nothing required the ALJ to assign less weight to Douglass's opinion than the examining sources. While § 404.1527(c) reads that the agency "[g]enerally" gives more weight to examining sources, it fails to mandate such prioritizing and lists several other factors that the ALJ must consider, including consistency with the whole record. 20 C.F.R. § 404.1527(c); *see also* Soc. Sec. Rul. No. 96-6p, 1996 WL 374180, at *3 ("In appropriate circumstances, opinions from State agency medical and psychological consultants . . . may be entitled to greater weight than the opinions of . . . examining sources."). Second, nothing required the ALJ to address each section of Douglass's assessment independently; the ALJ's summary of Douglass's overall conclusions sufficed.

*Remaining arguments.* Livingston also lodges several undeveloped complaints against the ALJ's adjudication. For example, he blames the ALJ for substituting his own lay opinion for that of the medical professionals. But Livingston points us to no specific examples, and reviewing the ALJ's opinion, we find none. In the single case from this circuit that Livingston cites for this proposition, the ALJ "play[ed] doctor" by casting aside a treating physician's opinion in favor of an "independent determination" about the claimant's pain. *See Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009). Here, the ALJ neither discarded medical evidence nor independently determined Livingston's psychological symptoms but instead properly weighed each medical opinion, tethering his residual functional capacity conclusions to those findings. To the extent that Livingston's "lay opinion" critique reflects discomfort with the ALJ's evaluating functional capabilities at all, that, of course, is precisely the ALJ's role. *See* 20 C.F.R. § 404.1527(d)(2).

Livingston further alleges that the ALJ failed to articulate "good reasons" for not following the examining source opinions. But the ALJ stopped short of disregarding any of the consulting opinions and merely assigned some of them limited weight. Moreover, as discussed above, the "good reasons" requirement applies only to treating physicians, and Livingston concedes that the ALJ considered only "examining source opinions." Appellant Br. at 30; *see* C.F.R. § 404.1527(c)(2); *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009); *Smith*, 482 F.3d at 876.

Livingston also asserts in passing that the "burden of proof at step five [of the regulatory framework] rests with the Commissioner." But the ALJ's analysis ended at step four, and the claimant bears the burden of proof through that stage. *See* 20 C.F.R. § 404.1520(a)(4); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003); *Her*, 203 F.3d at 391.

Finally, Livingston briefly argues two points relating to the ALJ's ultimate residual functional capacity determination. First, he complains that the ALJ failed to define terms in the residual functioning conclusion and did not explain how he arrived at the final determination. But the ALJ's detailed consideration of the record evidence in reaching the residual functional capacity conclusion directly contradicts these allegations.

Second, although Livingston waives his challenge to the hypothetical questions, Appellant Br. at 3 n.2, he still asserts that the ALJ failed to articulate why he arrived at the 5% off-task restriction rather than the 20% off-task limitation the ALJ presented in a hypothetical to a vocational expert at the hearing. The ALJ asked this question only after posing three other questions with the 5% restriction. Additionally, the ALJ asked the hypothetical incorporating the 20% off-task limitation in relation to Livingston's statements about frequent bathroom visits, rather than his psychological impairments. After considering Livingston's responses at the hearing, and his ability to sit through the one-hour session without a break, the ALJ concluded that Livingston could physically and psychologically "perform adequately at a job that conforms to the parameters set forth in this assessment," which incorporated a 5% off-task finding. R. 8-2, PageID 48. This, combined with the ALJ's thorough marshalling of the record evidence, provided substantial evidence for his ultimate residual functional capacity determination.

**III.**

We AFFIRM.